# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

IN RE:

                                                      BK 11-70573

RODNEY HALEY,

        Debtor.

                                                    AP 11-70016

PORTER CAPITAL CORPORATION,

        Plaintiff

vs.

RODNEY HALEY,
SOBCON CONCRETE COMPANY, INC.

        Defendants.

## MEMORANDUM OPINION

This adversary proceeding came before this court on March 13, 2013 and March 18, 2013 for trial on Porter Capital Corporation's ("Porter Capital") Fourth Amended Complaint. Burt W. Newsome appeared on behalf of Porter Capital; Marshall Entelisano appeared on behalf of Rodney Haley ("Debtor"); James O. Standridge and S. Scott Hickman appeared on behalf of Sobcon Concrete Company, Inc. ("Sobcon"). After reviewing the evidence admitted at trial and the arguments of the parties this court **OVERRULES** Porter Capital's objection to the dischargeability of its debt and **DENIES** Porter Capital's request for a judgment in its favor against Sobcon.

## JURISDICTION

The district court has jurisdiction of this adversary proceeding pursuant to 28 U.S.C. § 1334(a) & (b). Jurisdiction is referred to the bankruptcy courts by the General Order of Reference

1

of the United States District Court for the Northern District of Alabama, signed July 16, 1984, as Amended July 17, 1984 pursuant to 28 U.S.C. § 157(a). The bankruptcy court may enter an appropriate order and judgment pursuant to 28 U.S.C. § 157(b)(I).

## FINDINGS OF FACT

Debtor filed a voluntary bankruptcy petition pursuant to Chapter 7 of the United States Bankruptcy Code on March 18, 2011. (Bk. Doc. 1). On May 18, 2011, Plaintiff commenced this adversary proceeding by filing the Complaint to Determine "Discharge Ability" of Debt Under 11 U.S.C. § 523 and Objection to Discharge Under 11 U.S.C. § 727.[1]

Debtor owned and managed Custom Steel and Supply ("Custom Steel") prior to his filing bankruptcy. Custom Steel sold rebar and concrete reinforcement, which is placed in foundations, slabs, and buildings before concrete is poured. Custom Steel would buy rebar from a supplier and then cut it and bend it to the customer's specifications. Sobcon was one of Custom Steel's largest customers.

In order to help finance the daily operations of Custom Steel, Debtor entered into a Commercial Financing Agreement ("Factoring Agreement") with Porter Capital on July 31, 2003.[2]

_____

[1]The Fourth Amended Complaint does not set forth a cause of action objecting to Debtor's discharge, only an objection to the dischargeability of the debt owed to Porter Capital pursuant to 11 U.S.C. § 523(a)(2)(A) and 11 U.S.C. § 523(a)(2)(B).

[2]There is some confusion as to when Sobcon, through its employees, became aware of the Factoring Agreement between Custom Steel and Porter Capital. In his deposition, John Scarbrough testified that he became aware of the Factoring Agreement sometime between November 2009 and September 2010. (Porter Capital Exhibit 1, Pages 9-10). It is clear from his testimony at trial that while John Scarbrough was aware that there was a Factoring Agreement, he was not aware of the legal implications of a Factoring Agreement. It should be noted that all of the Disputed Invoices, as well as all the invoices admitted into evidence by Debtor, list the following address in the upper left-hand corner: Custom Steel, c/o Porter Capital, P.O. Box 12105, Birmingham, AL 35202. (Porter Capital Exhibit 7 & Haley Exhibit 6). In addition, on

2

(Exhibit 1 to Porter Capital Exhibit 2). Debtor would submit the invoices it sent to customers to Porter Capital along with satisfactory proof that the materials shown on the invoices were actually delivered. Porter Capital would examine the invoice and if approved, would advance Custom Steel 80% of the face value of the invoice. The invoice became an accounts receivable of Porter Capital. When Porter Capital received payment on the invoice from one of Custom Steel's customers, Porter Capital would reimburse itself for the 80% advance given to Custom Steel, charge a fee, and the balance was placed in a reserve account in the name of Custom Steel. Debtor could draw on this account at any time. If Custom Steel received a payment on an invoice that was factored by Porter Capital, it was under an obligation to forward that payment to Porter Capital. (Exhibit G to Exhibit 1 to Porter Capital Exhibit 2). Debtor admits that he is liable for any money advanced to Custom Steel by Porter Capital that Porter Capital was not able to collect from Custom Steel's customers.

At the heart of this adversary proceeding are 19 disputed invoices that Custom Steel submitted to Porter Capital for payment ("Disputed Invoices"). Debtor admitted at his deposition and at trial that he submitted the disputed invoices to Porter Capital and that he received an 80%

---

October 15, 2010, Porter Capital sent a certified letter to Sobcon. (Porter Capital Exhibit 6). Even though the letter was wrongly addressed to DCH Medical Center c/o Sobcon, Sobcon admits that it received the letter on October 15, 2010. The letter informed Sobcon of the Factoring Agreement between Custom Steel and Porter Capital and further informed Sobcon that "payment on all invoices should be made payable to and mailed directly to [Porter Capital]." (Porter Capital Exhibit 6). Although an employee of Porter Capital testified that a copy of the notice of the Factoring Agreement went out with every invoice Porter Capital mailed, no supporting documentation was introduced into evidence. In addition, an employee who had been with Sobcon for 13 years testified that she did not recall receiving any invoices from Porter Capital with any documents attached. The court found her testimony to be more credible. Therefore, the court finds that the certified letter dated October 15, 2010 was the first written notice of the Factoring Agreement between Custom Steel and Porter Capital that Sobcon received.

advance on the disputed invoices. (Porter Capital Exhibit 2, Page 14). After Porter Capital paid Custom Steel for these invoices, the invoices were allegedly sent to Sobcon for payment. Shortly after these invoices were paid by Porter Capital, Debtor realized that he would no longer be able to keep Custom Steel open. Around this time Debtor and John Scarbrough, the owner of Sobcon, had a conversation concerning invoices that might be sent to Sobcon after Custom Steel was closed for business. John Scarbrough testified at his deposition on November 2, 2011, that in the course of the aforementioned conversation, Debtor told him that he didn't need to worry about any invoices received. (Porter Capital Exhibit 1, Pages 15-17). Scarbrough took this to mean that he did not owe any money for any outstanding invoices. His testimony at trial was consistent with this. Debtor testified at his deposition on November 2, 2011, that he told John Scarbrough that if there were any discrepancies with invoices or that if Scarbrough felt he did not owe any money on a particular invoice that Debtor had a reserve account that would offset any remaining balance. (Porter Capital Exhibit 2, Pages 12-13). Debtor's testimony at trial was consistent with this testimony.

On January 20, 2011, Porter Capital's attorney sent Sobcon a letter requesting payment of $69,198.61. (Exhibit 1 of Porter Capital Exhibit 1). This amount included payment due on the Disputed Invoices and attorney fees. The letter itemized the invoice numbers of the Disputed Invoices.

On February 2, 2011, Sobcon's attorney sent a letter to Porter Capital's attorney asserting that Sobcon did not owe Porter Capital for the Disputed Invoices because "Sobcon [did] a thorough accounting of all [its] transactions with Custom Steele and [it has] no record of any invoices matching the above referenced numbers." (Exhibit 2 to Porter Capital Exhibit 1). The letter further stated that Sobcon suspected that Custom Steel "fabricated the above invoices to Porter Capital."

4

On May 12, 2011, John Scarbrough swore in an affidavit that: "Upon a full investigation of Sobcon Concrete, Inc.'s records, said [Disputed Invoices] were never sent to Sobcon Concrete, Inc. by Custom Steel and Supply Inc. and Rodney Haley for collection and the services and Sobcon Concrete, Inc. does not owe any sums to Custom Steel and Supply, Inc. [The Disputed Invoices], totaling the sum of $60,172.70 are all fraudulent invoices generated by Custom Steel and Supply, Inc. and Rodney Haley."[3] (Haley Exhibit 3). Again, the invoice numbers of the Disputed Invoices were itemized. John Scarbrough's testimony at trial was substantially the same.

Despite the strong denials in the letters sent by or on behalf of Sobcon, at least 5 of the 19 Disputed Invoices were due to be paid. In fact, three of the invoices[4] were paid by Sobcon to Custom Steel in September of 2010, well before the first letter was written by Sobcon on February 2, 2011. (Sobcon Exhibit 6). On January 3, 2013 Sobcon admitted that it owed payment on two more of the Disputed Invoices, invoice #32209 and invoice # 32217. (Haley Exhibit 4).

The following chart details the relevant evidence regarding the Disputed Invoices, which were admitted into evidence as Porter Capital Exhibit 7 and Sobcon Exhibit 4:

| Date of Invoice | Invoice Number | Amount of Invoice | Proof of Delivery | Status |
|---|---|---|---|---|
| 06/17/2010 | 31961 | $7,290.00 | Delivery Ticket dated 06/17/10 (Sobcon Exhibit 6) | Not Paid |

---

[3]John Scarbrough testified in his deposition that he had a good business relationship with Custom Steel, a company owned and run by Debtor until it failed in September 2010. He further testified that he and Debtor had always gotten along and that he thought Debtor was an honest man. It is not clear to this court why or when John Scarbrough became convinced that Debtor was not an honest man and had submitted fraudulent invoices.

[4]Invoice #32128, invoice #32149, and invoice #32151

5

| | | | | |
|---|---|---|---|---|
| 06/18/2010 | 31965 | $4,690.00 | Delivery Ticket dated 06/18/10 (Sobcon Exhibit 12) | Not Paid |
| 06/30/2010 | 32030 | $3,111.00 | Delivery Ticket dated 06/30/10 (Sobcon Exhibit 6) | Not Paid |
| 07/02/2010 | 32038 | $3,316.00 | Delivery Ticket dated 07/01/10 (Sobcon Exhibit 7) | Not Paid |
| 07/26/2010 | 32128 | $187.20 | No Delivery Ticket was found in the documents, but Sobcon admitted delivery by paying the invoice. | Payment was made to Custom Steel on September 22, 2010 by Check Number 10839 (Haley Exhibit 5).[5] |
| 07/26/2010 | 32129 | $3,168.00 | Delivery Ticked dated 07/26/10 (Sobcon Exhibit 6) | Not Paid |
| 07/27/2010 | 32140 | $4,937.00 | Delivery Ticket dated 07/26/10 (Sobcon Exhibit 8) | Not Paid |

[5]Haley Exhibit 5 does not include the invoice and delivery ticket for invoice #32128. However, Check Number 10839 included in Haley Exhibit 5 shows that the check was for payment on invoice #32128, invoice #32149, and invoice #32151. Also, the total of all three invoices equals the amount paid by Check Number 10839.

| | | | | |
|---|---|---|---|---|
| 07/28/2010 | 32149 | $597.20 | Delivery Ticket dated 07/27/10 (Haley Exhibit 5) | Payment was made to Custom Steel on September 22, 2010 by Check Number 10839 (Haley Exhibit 5) |
| 07/28/2010 | 32150 | $4,165.00 | Delivery Ticket dated 07/28/10 (Sobcon Exhibit 5) | Not Paid |
| 07/28/2010 | 32151 | $199.50 | Delivery Ticket dated 07/27/10 (Haley Exhibit 5) | Payment was made to Custom Steel on September 22, 2010 by Check Number 10839 (Haley Exhibit 5) |
| 08/02/2010 | 32166 | $4,165.00 | Delivery Ticket dated 08/03/10 (Sobcon Exhibit 5) | Not Paid |
| 08/10/2010 | 32202[6] | $2,609.00 | Delivery Ticket dated 08/10/10 (Porter Capital Exhibit 8) | Not Paid |

---

[6]This invoice was submitted to Porter Capital on August 10, 2010 for payment. (Porter Capital Exhibit 8).

7

| | | | | |
|---|---|---|---|---|
| 08/11/2010 | 32209[7] | $600.00 | Delivery Ticket dated 08/10/10 (Porter Capital Exhibit 8) | Invoice was paid by Check 13463 dated February 23, 2012. (Haley Exhibit 4) |
| 08/13/2010 | 32217[8] | $163.50 | Delivery Ticket dated 08/11/10 (Porter Capital Exhibit 8) | Invoice was paid by Check 13463 dated February 23, 2012. (Haley Exhibit 4) |
| 08/16/2010 | 32222[9] | $4,637.80 | Delivery Ticket dated 08/16/10 (Porter Capital Exhibit 8) | |
| 08/18/2010 | 32233[10] | $5,618.00 | Delivery Ticket dated 08/18/10 (Porter Capital Exhibit 8) | Not Paid - Sobcon alleges it received material from another vendor (Sobcon Exhibit 10A) |

---

[7]This invoice was submitted to Porter Capital on August 11, 2010 for payment. (Porter Capital Exhibit 8).

[8]This invoice was submitted to Porter Capital on August 13, 2010 for payment. (Porter Capital Exhibit 8).

[9]This invoice was submitted to Porter Capital on August 16, 2010 for payment. (Porter Capital Exhibit 8).

[10]This invoice was submitted to Porter Capital on August 18, 2010 for payment. (Porter Capital Exhibit 8).

8

| 08/25/2010 | 32250[11] | $4,870.00 | Delivery Ticket dated 08/25/10 (Porter Capital Exhibit 8) | Not Paid |
|---|---|---|---|---|
| 09/02/2010 | 32273[12] | $4,873.00 | Delivery Ticket dated 09/02/10 (Porter Capital Exhibit 8) | Not Paid |
| 09/10/2010 | 32290[13] | $975.50 | Delivery Ticket dated 09/10/10 (Porter Capital Exhibit 8) | Not Paid - Sobcon alleges it received material from another vendor (Sobcon Exhibit 11) |

As this case turns on whether the materials listed on the Disputed Invoices were actually delivered to Sobcon, the records kept by each of the three parties involved in this adversary proceeding are paramount. Therefore, a brief summary of the record keeping systems utilized by each of the three parties is in order.

First, the court will summarize the record keeping system utilized by Custom Steel. Custom Steel did not require the use of purchase orders. Instead, customers would call Custom Steel and order rebar and concrete reinforcement. The order would be then recorded on a three-part delivery

---

[11]This invoice was submitted to Porter Capital on August 25, 2010 for payment. (Porter Capital Exhibit 8).

[12]This invoice was submitted to Porter Capital on September 2, 2010 for payment. (Porter Capital Exhibit 8).

[13]This invoice was submitted to Porter Capital on September 10, 2010 for payment. (Porter Capital Exhibit 8).

9

ticket.[14]

One part of the delivery ticket was kept in the office and used to generate an invoice which was later mailed to the customer. The delivery ticket kept in the office was also used to prepare a Schedule of Accounts, which listed the date of an invoice, the name of Custom Steel's customers, the invoice number, and the amount of the invoice. The Schedule of Account would then be submitted to Porter Capital for payment on the listed invoices. Various Schedules of Accounts were admitted into evidence and are found in Porter Capital Exhibit 8. All of the Schedules of Account admitted into evidence were signed by Debtor.[15]

The remaining two parts of the delivery ticket went to the shop, where the ordered materials were assembled. At least one of the two remaining parts of the delivery ticket was taken by the delivery driver. Custom Steel did not require its customers to sign the delivery ticket at the time of delivery, nor did it require a representative from the customer to be at the delivery site to accept delivery. If a representative from the customer was present at the time of delivery, the delivery driver would leave the delivery ticket with the customer. It is not clear what the delivery driver would do with the delivery ticket if there was not a representative from the customer present at the time of delivery. Delivery tickets associated with all of the Disputed Invoices except one[16] were

---

[14]Debtor would sometimes take these orders over the phone, but there was no evidence as to who else at Custom Steel the authority to take customer's orders.

[15]The Schedules of Accounts admitted into evidence show submission of about half of the Disputed Invoices to Porter Capital. However, Debtor admitted that he submitted all of the Disputed Invoices to Porter Capital for payment and further admitted that he received payment on all of the Disputed Invoices from Porter Capital.

[16]A delivery ticket for invoice 32128 was not admitted into evidence, but Sobcon admitted the materials were delivered when it paid the invoice.

admitted into evidence. None of these delivery tickets indicate who placed the order, who took the order, who made the delivery, or who received the delivery.

In short, there was a lack of formality in Custom Steel's record keeping system. This lack of formality is illustrated by the laissez faire attitude taken toward the ordering and delivery of materials, as well as the placing of various sticky notes on the Schedules of Accounts submitted to Porter Capital for payment.[17]

The court will next address the record keeping system utilized by Sobcon. Sobcon did not require the use of purchase orders. Instead, Sobcon placed orders with Custom Steel for rebar and concrete reinforcements over the telephone. The foreman on a project had authority to place these orders and there were approximately 5 or 6 different foremen at Sobcon during the relevant time period. Although an employee of Sobcon testified that the foreman on a project would note on the daily job sheet when an order for materials was placed, none of these job sheets were admitted into evidence and no foreman testified as to how the daily job sheets were maintained.[18] When it was time for materials to be delivered by Custom Steel, Sobcon did not require a signature on any delivery ticket, nor did Sobcon require that a representative from its office be present at the delivery site. If someone happened to be present to receive a delivery ticket from Custom Steel, such delivery ticket would be placed in a folder at Sobcon's office. Sobcon's record keeping system consisted mainly of maintaining a job folder for every project; all paperwork relating to a particular job went

_____

[17]The sticky notes put on various Schedules of Accounts included notes that Custom Steel was forwarding checks to Porter Capital that had been sent to Custom Steel by mistake. (Porter Capital Exhibit 8).

[18]A representative of Sobcon did testify that she reviewed the daily sheets from the various jobs and could not identify where a foreman had placed an order consistent with the Disputed Invoices.

in the folder. When Sobcon received invoices from Custom Steel, the invoices would be compared to any delivery tickets contained in the job folder. There was no evidence of whether or how a delivery ticket would be placed in a job folder if a representative from Sobcon was not present at the delivery site.

As with Custom Steel, there is lack of formality in Sobcon's record keeping system. This lack of formality is again illustrated by the laissez faire attitude taken toward the ordering and delivery of materials.

Finally, the court will address the record keeping system utilized by Porter Capital. There was no evidence introduced as to the general record keeping practiced by Porter Capital, but that is to be expected as the only record keeping that really matters is that relating to proof that an invoice submitted for payment was legitimate. An employee of Porter Capital testified that Porter Capital required proof of delivery before it would advance money on a submitted invoice. The employee further testified that an employee of Porter Capital would call and verify delivery on every invoice it received. While this may be the preferred policy at Porter Capital, this court finds that it was not the actual practice. First, if an employee called to verify every invoice, how could Debtor possibly submit fraudulent invoices for payment? Porter Capital would have caught any fraudulent invoices before it advanced money, and this lawsuit would not have been filed. Second, an employee of Sobcon testified that in 13 years of employment with Sobcon, she could only remember one instance where Porter Capital called to verify an invoice, and that was because the invoice was particularly large. The evidence suggests that the delivery ticket submitted by Custom Steel was sufficient proof of delivery for Porter Capital unless the invoice was particularly large and then a phone call was made to verify that delivery actually occurred. In short, the records kept by Porter Capital do not

12

help this court determine whether delivery of the materials invoiced on the Disputed Invoices actually occurred.

In fact, none of the records kept by the parties were helpful in determining whether the materials invoiced on the Disputed Invoices were actually delivered to Sobcon. This will prove to be very significant in determining whether Debtor or Sobcon owe Porter Capital for the money advanced to Custom Steel for the Disputed Invoices.

## CONCLUSIONS OF LAW

Porter Capital's Fourth Amended Complaint seeks a declaration that the $86,141.52 debt allegedly owed to it by Debtor is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and 11 U.S.C. § 523(a)(2)(B). In addition, Porter Capital seeks a judgment against Sobcon in the amount of $86,141.52. Porter Capital asserts that Sobcon owes it for the cost of materials allegedly delivered to Sobcon by Debtor which Sobcon has not paid. In addition, Porter Capital asserts that Sobcon is liable to it pursuant to § 7-9A-406 of the Code of Alabama for any monies paid on invoices to Custom Steel and/or Debtor that were not forwarded to Porter Capital. The court will first address whether the debt owed to Porter Capital is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and 11 U.S.C. § 523(a)(2)(B).

I.  Is the debt allegedly owed to Porter Capital nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A)

In a trial on a complaint objecting to the dischargeability of a debt, the plaintiff bears the burden of proving that a debt is nondischargeable. To carry its burden, the plaintiff must prove such discharge is unwarranted by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 287, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991). Section 523(a)(2)(A) provides that:

13

(a) A discharge under section 727 . . . . of this title does not discharge an individual debtor from any debt-
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by-
>> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A). "Courts have generally interpreted § 523(a)(2)(A) to require the traditional elements of common law fraud." Sec. and Exch. Comm'n v. Bilzerian (In re Bilzerian), 153 F.3d 1278, 1282 (11th Cir. 1998). Therefore, in order to meet its burden of proof on its claim pursuant to 11 U.S.C. § 523(a)(2)(A), Porter Capital must show by a preponderance of the evidence that: (1) Debtor made a false representation to deceive Porter Capital; (2) Porter Capital relied on the misrepresentation; (3) the reliance was justified; and (4) Porter Capital sustained loss as a result of the misrepresentation. Id. See also Taylor v. Wood (In re Wood), 245 Fed. Appx 916, 917-18 (11th Cir. 2007).

Porter Capital asserts that Debtor submitted fraudulent invoices, i.e. invoices which did not represent an actual order placed by a customer, and that the submission of the fraudulent invoices constitutes a false representation. Porter Capital's first assertion, that Debtor submitted fraudulent invoices will be examined first.

There is no evidence that this court can point to which proves the Disputed Invoices are fraudulent. First, all of the Disputed Invoices had delivery tickets with the exception of one, but Sobcon admitted that invoice was legitimate when it paid the invoice. Second, although none of the delivery tickets were signed, this was not unusual as testified to by both Debtor and employees of Sobcon. Neither Debtor nor Sobcon required that there be a representative of Sobcon present when delivery of materials was made and both parties admitted that there were times when deliveries were

14

made and no one from Sobcon was on the job site. Because the Disputed Invoices all have delivery tickets, and the delivery tickets are in a form that was consistent with past practice, there is no discrepancy between the Disputed Invoices and the legitimate invoices that this court can point to as evidence that the Disputed Invoices are fraudulent.

Finally, there are no internal records of either Custom Steel or Sobcon that were introduced into evidence that prove that the Disputed Invoices are fraudulent. Sobcon did not use purchase orders: employees would call and place orders on a jobsite and would note in daily job sheets whether material was ordered. Because there were no purchase orders and the daily job sheets were not admitted into evidence, it is impossible for this court to compare the invoices generated by Debtor to the actual purchases made by Sobcon. Even if the daily job sheets were introduced into evidence, this court has little confidence in the state of Sobcon's records. After receiving a letter demanding payment of $69,198.61 for unpaid invoices from Porter Capital's attorney in January 2011, Sobcon reviewed its records and responded via letter that it did not owe Porter Capital for the Disputed Invoices because "Sobcon [did] a thorough accounting of all [its] transactions with Custom Steele and [it has] no record of any invoices matching the above referenced numbers." The letter further stated that Sobcon suspected that Custom Steel "fabricated the above invoices to Porter Capital." On May 12, 2011, John Scarbrough swore in an affidavit that: "Upon a full investigation of Sobcon Concrete, Inc.'s records, said [Disputed Invoices] were never sent to Sobcon Concrete, Inc. by Custom Steel and Supply Inc. and Rodney Haley for collection and the services and Sobcon Concrete, Inc. does not owe any sums to Custom Steel and Supply, Inc. [The Disputed Invoices], totaling the sum of $60,172.70 are all fraudulent invoices generated by Custom Steel and Supply, Inc. and Rodney Haley." After conducting a "thorough accounting" and "full investigation," Sobcon

15

later found that 5 of the Disputed Invoices were actually legitimate invoices: Invoice #32128, invoice #32149, and invoice #32151 were paid by Sobcon to Custom Steel in September of 2010, well before the first letter was written by Sobcon on February 2, 2011; further on January 3, 2013, Sobcon admitted that it owed payment on two more of the Disputed Invoices, invoice #32209 and invoice # 32217, by sending payment to Porter Capital on those two invoices. If Sobcon did another "thorough accounting" and "full investigation," would more of the Disputed Invoices turn out to be legitimate? It is entirely possible, and such possibility makes this court unable to rely on the record keeping of Sobcon.

Debtor's testimony regarding the record keeping utilized at Custom Steel suggests that Custom Steel's record keeping was not ideal either: When a customer called to place an order with Custom Steel, Debtor would either note the order on a delivery ticket or a piece of notebook paper. He would then give the delivery ticket to his secretary, who would generate an invoice. The invoice was then mailed to the customer. Again, Debtor did not require a purchase order be submitted by Custom Steel's customers. Therefore, any discrepancy on an invoice could be attributed to poorly maintained records, rather than fraud. This court is unable to rely on the record keeping of Debtor which makes it impossible to determine whether the Disputed Invoices are fraudulent.

It appears that neither Sobcon nor Custom Steel had safeguards in position to verify the ordering or receiving of materials. As a result, it is impossible for this court to determine whether these invoices are indeed fraudulent or whether Sobcon actually placed the order, but cannot find the records memorializing any such order.[19] Because this court is unable to determine whether the

---

[19]The testimony of the record-keeper of Sobcon, who was a former employee of Debtor, suggests that submitting fraudulent invoices could have been a common practice for Debtor: She testified that while she worked for Custom Steel, Debtor would generate invoices and submit it

Disputed Invoices are fraudulent, Porter Capital has failed to prove that Debtor made a false representation. Therefore, this court finds that Porter Capital has not met its burden of proof and that Porter Capital's objection to dischargeability pursuant to § 523(a)(2)(A) is due to be overruled.

II. Is the debt allegedly owed to Porter Capital nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(B)

Section 523(a)(2) provides that:

(a) A discharge under section 727 . . . . of this title does not discharge an individual debtor from any debt-
    (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by-
        (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
        (B) use of a statement in writing-
            (i) that is materially false;
            (ii) respecting the debtor's or an insider's financial condition;
            (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
            (iv) that the debtor caused to be made or published with the intent to deceive;

11 U.S.C. § 523(a)(2). Section 523(a)(2) has two subsections, (A) and (B). Subsection 523(a)(2)(A) provides that debts will not be discharged to the extent that the debtor obtained them by false pretenses, a false representation or actual fraud. Subsection 523(a)(2)(B) provides that debts will not be discharged if they were obtained by the use of false financial documents or statements. "Paragraphs (A) and (B) of § 523(a)(2) are mutually exclusive-the fact that Congress excluded debts obtained through use of false financial statements from paragraph (A), and dealt with those debts in

_____

to a bank for payment, but would tell her not to send the invoices to the customer. Although the rest of her testimony was credible, this court is reluctant to rely solely on the testimony of someone who left the employ of Custom Steel over a decade ago, especially since her testimony did not relate to the Disputed Invoices in this case, and no corroborating evidence was admitted. Her testimony alone is not sufficient to prove that the Disputed Invoices in this case were fraudulent.

a separate subparagraph (B), makes clear that a plaintiff must prove different evidence for each subsection." Gieseking v. Thomas, 358 B.R. 754, 766 (Bankr. S.D. Ill. 2007). See also Fairfax State Savs. Bank v. McCleary (In re McCleary), 284 B.R. 876, 883 (Bankr. N.D. Iowa 2002). None of the proof offered by Porter Capital at trial concerned statements in writing respecting Debtor's financial conditions. The documents primarily consisted of invoices prepared and submitted by Custom Steel, as well as Schedules of Accounts prepared and submitted by Custom Steel. Therefore, Porter Capital failed to offer evidence that would support a finding of a nondischargeable debt pursuant to § 523(a)(2)(B). In re McCleary, 284 B.R. at 884. Therefore, this court finds that Porter Capital has not met its burden of proof and that Porter Capital's objection to discharge pursuant to § 523(a)(2)(B) is due to be overruled.

III.  Does Sobcon owe Porter Capital for the materials invoiced on the Disputed Invoices?

Porter Capital asserts that if the Disputed Invoices are not fraudulent, then they must be legitimate and Sobcon must have received the materials invoiced. This assertion by Porter Capital is not correct. Porter Capital had the burden of proving that the Disputed Invoices were fraudulent. It did not do so. By failing to prove that the Disputed Invoices were fraudulent, Porter Capital did not prove that materials invoiced in the Disputed Invoices were delivered. These are two separate legal issues. This court will address in this section whether the materials invoiced on the Disputed Invoices were delivered to Sobcon.

Although Porter Capital is incorrect in its assertion that Sobcon necessarily received the materials invoiced on the Disputed Invoices because Porter Capital did not prove that the invoices are fraudulent, Porter Capital is correct in its assertion that Sobcon owes Porter Capital for the materials invoiced on the Disputed Invoices if Sobcon actually received said materials. As the

18

plaintiff in this case, Porter Capital has the burden of proving every material allegation in the complaint. Herzfeld Lumber Co. v. Langley, 93 So. 378, (Ala. Ct. App 1922.). In this case, that includes whether the materials invoiced on the Disputed Invoices were actually delivered to Sobcon. Id. See also Pomerantz Paper Corp. v. New Community Corp., 25 A. 3d 221, 233 (N.J. 2011) ("[The court must] first consider whether plaintiff bore its burden of proving that it was entitled to payment. That, in turn, requires that we begin with an evaluation of whether plaintiff demonstrated that it delivered the goods that were identified in the unpaid invoices."); Harvard Drug Group v. Health Spectrum, Inc., No. CL01-254, 2002 WL 32075217, at *1 (Va. Cir. Ct. 2002) (finding that "[p]laintiff failed to carry its burden of proof that delivery of the goods had occurred"). After a thorough review of the evidence, this court finds that Porter Capital failed to prove that Custom Steel actually delivered the materials invoiced on the Disputed Invoices to Sobcon.

The best evidence this court has of delivery are the unsigned delivery tickets associated with the Disputed Invoices. At this point, it should be reiterated that both Custom Steel and Sobcon had a very casual attitude toward record keeping and that they did business primarily over the telephone. Orders from Sobcon were taken over the phone and there was no purchase order, or any other documentary evidence, admitted into evidence that verified whether Sobcon actually placed an order. Custom Steel delivered materials to a site with no requirement that a representative from Sobcon be present to sign for delivery, nor did Sobcon require a representative to be present at the site to take possession of the delivery ticket and verify that the delivery was correct. Therefore, it is not surprising that the unsigned delivery tickets are the only documentary evidence available. Nor is it surprising that such delivery tickets are unsigned. Even the Disputed Invoices that Sobcon later admitted were legitimate had unsigned delivery tickets. Therefore, the fact that the delivery tickets

19

were unsigned does not prove that the materials were never delivered. Further, the fact that there are delivery tickets does not prove the materials were actually delivered because there is no way to prove that there is an actual order from Sobcon associated with the delivery ticket; without any safeguards against fraud, it would be very easy for Debtor to fabricate a delivery ticket. There just is no way to verify whether the materials invoiced on the Disputed Invoices were actually delivered by looking at the delivery tickets admitted into evidence. Therefore, the delivery tickets admitted into evidence are not conclusive evidence of delivery.

Unfortunately, the testimony is no more helpful than the delivery tickets: Debtor testified that Custom Steel delivered all materials on the Disputed Invoices; employees from Sobcon testified that Custom Steel did not deliver the materials on 14 of the 19 Disputed Invoices. Neither party was obviously lying. In support of his claims, Debtor admitted over 400 invoices from Custom Steel to numerous customers including Sobcon. These invoices were identical in form to the Disputed Invoices. These invoices prove nothing. Sobcon kept all records relating to a particular job in a folder. By consulting the job folders for each of the 8 different projects, Sobcon asserted it was able to determine which of the invoices sent to it by Porter Capital were legitimate. None of the job folders were introduced into evidence although Sobcon did admit various invoices into evidence that were grouped together by project. (Sobcon Exhibits 6, 7, 8, 9, 10A, 11 & 12). These invoices include paid Disputed Invoices, unpaid Disputed Invoices, and paid invoices that were not disputed. It is unclear what the court is supposed to surmise from these invoices. Again, these invoices prove nothing, especially considering the fact that Sobcon has twice discovered that some of the Disputed Invoices were actually legitimate after conducting at least two separate searches of its records.

After examining the evidence admitted and reviewing the testimony at trial, this court is left

20

with two equally plausible scenarios: Either Debtor is lying and Sobcon never ordered the materials invoiced on the Disputed Invoices; or the employees of Sobcon are lying and Sobcon received the materials invoiced on the Disputed Invoices. Because neither scenario is more likely than the other, Porter Capital has failed to meet its burden of proving that the materials invoiced on the Disputed Invoices were actually delivered to Sobcon. Therefore, Sobcon does not owe Porter Capital for the 14 Disputed Invoices where delivery is an issue.

### IV. Does Sobcon owe Porter Capital for the payments that Sobcon sent to Custom Steel that were not forwarded to Porter Capital?

Sobcon admitted delivery on 5 of the Disputed Invoices. These invoices are 32128, 32149, 32151, 32209, and 32217. On February 23, 2013, Sobcon sent Porter Capital Check Number 13463 as payment on invoice 32209 and 32217, so they are not at issue. Payment on invoice 32128, invoice 32149, and invoice 32151 was made to Custom Steel via Check Number 10839 dated September 22, 2010. Custom Steel did not forward this payment to Porter Capital. Porter Capital asserts that Sobcon is subject to double liability and still owes Porter Capital for these invoices pursuant to ALA. CODE § 7-9A-406.[20] Section 7-9A-406 provides, in pertinent part, that:

> (a) *Discharge of account debtor; effect of notification.* Subject to subsections (b) through (i), an account debtor on an account, chattel paper, or a payment intangible may discharge its obligation by paying the assignor until, but not after, the account debtor receives a notification, authenticated by the assignor or the assignee, that the amount due or to become due has been assigned and that payment is to be made to the assignee. After receipt of the notification, the account debtor may discharge its obligation by paying the assignee and may not discharge the obligation by paying the assignor.
>
> (b) *When notification ineffective.* Subject to subsection (h), notification is ineffective under subsection (a):

---

[20]The Factoring Agreement entered into by Debtor and Porter Capital provides that it is to be governed by the laws of Alabama, so the Alabama Uniform Commercial Code controls in this case. (Porter Capital Exhibit 2, Exhibit A, ¶ 27).

(1) if it does not reasonably identify the rights assigned; . . . .

ALA. CODE § 7-9A-406. From the evidence at trial, there are three ways in which Sobcon could possibly have received notification of the assignment of invoices from Custom Steel to Porter Capital. First, an employee of Porter Capital testified that a notice of assignment was sent out with every invoice mailed by Porter Capital and that Sobcon received the notification required by ALA. CODE § 7-9A-406 in this manner. This court did not find this testimony credible. No supporting documentation was introduced into evidence. In addition, an employee who had been with Sobcon for 13 years testified that she did not recall receiving any invoices from Porter Capital with any documents attached. While the practice of attaching the notice to every invoice might be part of the employee guidelines, this court finds that it was not being done in actuality. Therefore, the court finds that Sobcon did not receive the notification required by ALA. CODE § 7-9A-406 in this manner prior to the payment on invoices 32128, 32149, and 32151.

Second, Porter Capital asserts that Sobcon received the notification required by ALA. CODE § 7-9A-406 when John Scarbrough was informed by Debtor during the course of a conversation that Debtor entered into a Factoring Agreement with Porter Capital. Although John Scarbrough testified at his deposition that he became aware of the Factoring Agreement sometime between November 2009 and September 2010, it is clear from his testimony at trial that while he was aware that there was a Factoring Agreement, he was not aware of the legal implications of a Factoring Agreement. (Porter Capital Exhibit 1, Pages 9-10). Based upon this, the court finds that the conversation between John Scarbrough and Debtor did not reasonably identify the rights assigned by the Factoring Agreement. Therefore, the conversation was not an effective notification pursuant to ALA. CODE § 7-9A-406(b)(1).

Finally, it is clear that Sobcon received notice that payments were supposed to be sent to Porter Capital. This is clear because all the invoices admitted into evidence, list the following address in the upper left-hand corner: Custom Steel, c/o Porter Capital, P.O. Box 12105, Birmingham, AL 35202.[21] (Porter Capital Exhibit 7 & Haley Exhibit 6). The question that must be answered is whether notice of a different remittance address constitutes a notification of assignment. Section 7-1-202(d) of the Alabama Code provides the following definition: "A person 'notifies' or 'gives' a notice or notification to another person by taking such steps as may be reasonably required to inform the other person in ordinary course, whether or not the other person actually comes to know of it." ALA. CODE § 7-1-202. It is not reasonable to assume that the placement of a remittance address on an invoice that is different from the address of the company mailing out the invoice is sufficient notification of the assignment of such invoice. Citizens Bank of Corrigan v. J.M. Jackson Corp., 537 S.W.2d 120, (Tex. Civ. App. 1976) (holding that as a matter of law a notation on an invoice to make all checks payable to assignee did not constitute a notification reasonably identifying the rights of the assignee). Therefore, the presence of a different remittance address is not sufficient to satisfy the notification requirement contained in ALA. CODE § 7-9A-406.[22]

Sobcon did not receive the notification required by ALA. CODE § 7-9A-406 prior to the

---

[21]Note that the information contained on the invoice does not alert recipients of the invoices that it is Porter Capital, not Custom Steel, who is entitled to receive payments. Although Porter Capital's remittance address is listed, it still appears that Custom Steel is the proper party to pay.

[22]Although not a factor in this court's decision, it should be noted that Porter Capital was aware that Custom Steel was receiving payments on invoices after the assignment of the invoices to Porter Capital occurred. Some of the Schedules of Accounts submitted by Custom Steel had sticky notes notifying Porter Capital that checks were being forwarded to Porter Capital. At this point, perhaps Porter Capital should have followed-up to make sure that these customers were aware of the assignment of the invoices.

23

payment on invoices 32128, 32149, and 32151 being sent to Custom Steel. Pursuant to ALA. CODE § 7-9A-406, Sobcon could discharge its obligation on invoices 32128, 32149, and 32151 by paying Custom Steel, which Sobcon did. Therefore, Sobcon has no obligation to further pay Porter Capital for invoices 32128, 32149, and 32151.

## CONCLUSION

Porter Capital failed to prove that the debt owed to it by Debtor is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and 11 U.S.C. § 523(a)(2)(B). Therefore, Porter Capital's objection to the dischargeability of its debt is **OVERRULED**. Porter Capital failed to prove that the materials invoiced on the Disputed Invoices were actually delivered to Sobcon. Therefore, Porter Capital's request for a judgment against Sobcon for the amount due on 14 of the 19 Disputed Invoices is **DENIED**. Sobcon sent payment to Porter Capital for 2 of the 19 Disputed Invoices. Therefore, Porter Capital's request for a judgment against Sobcon for the amount due on these two invoices is **DENIED**. Porter Capital failed to prove that Sobcon is subject to double liability on 3 of the 19 Disputed Invoices pursuant to ALA. CODE § 7-9A-406. Therefore, Porter Capital's request for a judgment against Sobcon for the amount due on these three invoices is **DENIED.**

**DONE and ORDERED** this October 9, 2013.

/s/ C. Michael Stilson
C. Michael Stilson
United States Bankruptcy Judge

24